**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMAL HAMADE

   *Plaintiff,*

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

   *Defendant.*

_____/

CASE NO. 20-11363

HON. TERRENCE G. BERG
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15.)

## I. RECOMMENDATION

  Plaintiff Jamal Hamade challenges Defendant Commissioner of Social Security's final decision denying his claim for Title XVI Supplemental Security Income benefits ("SSI"). The case was referred to me for review. (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANTING** the Commissioner's motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision.

## II.   <u>REPORT</u>

### A.   **Introduction and Procedural History**

Plaintiff's application[1] for SSI was filed on May 10, 2018. (ECF No. 11, PageID.169–74.) Plaintiff alleged he became disabled on April 13, 2018. (*Id.* at PageID.169.) The Commissioner denied the claim. (*Id.* at PageID.114–18.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on December 19, 2019. (*Id.* at PageID.76–103.) The ALJ issued a decision on January 15, 2020, finding that Plaintiff was not disabled. (*Id.* at PageID.61–75.) The Appeals Council denied review on March 16, 2020. (*Id.* at PageID.54–58.) Plaintiff sought judicial review on May 12, 2020. (ECF No. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13, 15, 16.)

### B.   **Standard of Review**

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal

---

[1] While Plaintiff's SSI application was pending, Plaintiff appears to have applied for Social Security Disability Insurance Benefits. Plaintiff's application was denied on May 6, 2018. (ECF No. 11, PageID.141.) Plaintiff's claim was denied because he did not meet the insured status requirements, and thus no decision was made about the status of Plaintiff's disability. (*Id.* at PageID.141, 182.) This claim was not subject to further appeal or review.

quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a

combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform

given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11, PageID.72.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since April 30, 2018, the application date[2]. (*Id.* at PageID.66.) At step two, the ALJ concluded that Plaintiff's severe impairments were intermittent explosive disorder and substance abuse disorder. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.*) Next, the ALJ found Plaintiff had the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to the performance of jobs that can be learned in 30 days or less, and that are routine in nature. He requires work that involves no contact with the general public. He can tolerate no more than superficial contact with co-workers and no more than occasional contact with supervisors.

(*Id.* at PageID.67.) At step four, the ALJ made an expedited finding about Plaintiff's past relevant work: first, several of Plaintiff's past performed jobs were not substantial gainful activity; second, the record is not clear as to Plaintiff's past relevant work. (*Id.* at PageID.70.) In light of the insufficient evidence, the ALJ proceeded to step five. (*Id.*) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (*Id.* at PageID.71.) This included cleaners and packers at

---

[2] There appears to be a discrepancy in the application date, between the ALJ finding and the transcript record's application record of May 10, 2018 (*id.* at PageID.169). Given the findings that Plaintiff is not disabled, the date is not consequential.

both the light and medium levels. (*Id.*) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.72.)

### E.    Administrative Record

#### 1.    Overview of Medical Evidence

##### a.    Treatment Notes

Plaintiff claimed his mental conditions of psychosis, delusional, psychotic, and bipolar all limit his ability to work. (ECF No. 11, PageID.188.)

In April 2018, Plaintiff was hospitalized[3] at Ascension Providence Hospital following police contact and response to Plaintiff's threats via Facebook to Chase Bank and its CEO. (*Id.* at PageID.258.) Plaintiff denied suicidal and homicidal ideations (other than the threats he made to people at Chase Bank). (*Id.*) He denied visual or auditory hallucinations. (*Id.*) Plaintiff claimed that someone from Chase Bank tried to shoot him and his mother. (*Id.*) Plaintiff had an unremarkable physical examination, save for a flat affect. (*Id.* at PageID.259.) He was in no acute distress and had stable vitals. (*Id.*) Plaintiff was medically cleared awaiting consultation with a social worker. (*Id.*) Later, he was accepted for transfer to Common Ground. (*Id.* at PageID.264.)

Plaintiff was transferred from Common Ground, was sent to Havenwyck Hospital, and was evaluated by Dr. Kodali. (*Id.* at PageID.278, 280.) Plaintiff had an unremarkable

---

[3] Plaintiff provided, with his motion for summary judgment, his court records of the petition for mental health treatment from the Oakland County Probate Court. (ECF No. 13, PageID.513–53.) These specific records do not appear to be part of the transcript record of his SSI disability claim. The petition includes clinical certificates stating diagnoses of schizoaffective disorder, psychosis not otherwise specified / delusional, and psychotic disorders / bipolar manic. (*Id.* at PageID.515, 517, 519.) Plaintiff was described as having poor insight as to the need for treatment. (*Id.* at PageID.516. *See also id.* at PageID.518, 520.) These documents would precede his hospitalization.

physical exam, including 5/5 motor strength in four extremities and normal gait and reflexes. (*Id.* at PageID.279.) The assessment included schizoaffective disorder, psychosis, fatigue, and marijuana abuse. (*Id.*) Plaintiff's assets included him living with his mother, he was physically healthy, and this was his first time with admission. (*Id.* at PageID.282.) His limitations included his admitted "terroristic threats", his persistent paranoia, and his refusal to take medications. (*Id.*) When medication was eventually administered, Plaintiff was well tolerating Seroquel, Trazodone, and Depakote. (*Id.* at PageID.288.) Later, Plaintiff again refused medication, which resulted in the medication changing to Haldol and Zyprexa. (*Id.* at PageID.289.) By April 26, 2018, records showed Plaintiff was making progress, and this was described as a "significant improvement". (*Id.* at PageID.292.) Plaintiff was quieter, more pleasant, and not exhibiting paranoia or threatening behavior. (*Id.*) Plaintiff developed insight and was compliant with medication. (*Id.*)

Plaintiff was evaluated in April 2018 by Easter Seals Michigan. (*Id.* at PageID.348.) Plaintiff was described as oriented 3x, but with a flat affect and impaired insight. (*Id.* at PageID.351.) He had appropriate intellectual functioning for his age and academic achievement. (*Id.*) He had guarded attitude or behavior. (*Id.* at PageID.359.) Plaintiff understood he was under a 45-day treatment order, and he was unhappy to be under the order or to take medication. (*Id.* at PageID.351.) Plaintiff denied past mental health issues, depression, anxiety, manic behaviors, hallucinations, delusions, paranoia, or panic attacks. (*Id.*) He denied anger issues. (*Id.*) Plaintiff reported being incarcerated in several facilities in Michigan from the age of 15 years old to 19 years old. (*Id.*) He was not specific as to how that affected him. (*Id.*) Plaintiff was prescribed Depakote and Haldol upon discharge

from Havenwyck, but Plaintiff has not taken the medication since his discharge. (*Id.* at PageID.352.) He reported smoking marijuana one to two times per week, and he denied that this is problematic, and he denied other substance use. (*Id.* at PageID.357.) Plaintiff had a diagnosis of psychotic disorder NOS. (*Id.* at PageID.363.) He had a GAF score of 55. (*Id.* at PageID.340.)

In May 2018, Plaintiff returned to Easter Seals for a psychiatric evaluation. (*Id.* at PageID.328.) Plaintiff continued to not take prescribed medication. (*Id.*) His mental status exam included these descriptions of Plaintiff: cooperative attitude, dysphoric mood, constricted affect, normal psychomotor activity, normal speech, average intellectual functioning, no hallucinations, goal-directed thought process, intact associations, normal thought content with no suicidal ideation, fair attention and concentration and impulse control, fair judgment, and no insight. (*Id.* at PageID.330–32.) His depression assessment was negative. (*Id.* at PageID.333.)

Plaintiff made a threat to a Common Ground therapist, though Plaintiff's description was summarized as "He stated that he has no desire to harm anyone at CG and feels he got what he needed to off of his chest . . . ." (*See id.* at PageID.304, 311, 313.)

Plaintiff was discharged from Easter Seals in July 2018. (*Id.* at PageID.300.) At the time of discharge, Plaintiff was stopping treatment against medical advice. (*Id.* at PageID.301.)

Plaintiff returned for service at Easter Seals in January 2019. (*Id.* at PageID.433.) He returned to Easter Seals to try to get Social Security disability benefits and to find himself. (*Id.* at PageID.436, 449.) Plaintiff continued to not take medication, continued to

use marijuana daily, and declined to discuss physical health issues. (*Id.* at PageID.449.) Plaintiff's disposition noted that Plaintiff would benefit from ongoing medication, case management services, therapy, and ongoing monitoring and support. (*Id.*)

In February 2019, Plaintiff's diagnosis was changed: psychotic disorder was designated inactive, and currently active were intermittent explosive disorder and cannabis dependence. (*Id.* at PageID.416.) This evaluation was made by Dr. Guy. (*Id.* at PageID.419.) Also, Plaintiff's impulse control was described as impaired, and his judgment and insight were impaired. (*Id.* at PageID.414–15.) The following were within normal limits: mood, affect, psychomotor activity, speech, thought process, attention/concentration, and weight/appetite. (*Id.* at PageID.413–15.)

Plaintiff refused medication for intermittent explosive disorder. (*Id.* at PageID.397.)

Plaintiff attended a session with the Wrap for Trauma for Men program. (*Id.* at PageID.384.) The program was about personal wellness, prevention techniques, crisis management, and wellness strategies. (*Id.* at PageID.384–85.) He attended additional sessions. (*Id.* at PageID.380, 382, 489, 499.) Plaintiff was prescribed Chantix for nicotine dependence. (*Id.* at PageID.486.)

In addition to the diagnoses of intermittent explosive disorder and cannabis dependence, Plaintiff was diagnosed with paranoid personality disorder in October 2019. (*Id.* at PageID.470.)

Plaintiff continued to be angry about his past experiences with Chase Bank, his hospitalization, and his time in jail. (*Id.* at PageID.463.) Plaintiff refused medication for his intermittent explosive disorder. (*Id.*) He reported success with Chantix to help him stop

smoking, but he continued to use marijuana. (*Id.* at PageID.465.) Plaintiff asked if marijuana was medication. (*Id.*)

Plaintiff's concern was to try to get SSI benefits to support himself financially. (*Id.* at PageID.463, 474.)

### b.    Opinion Evidence

Plaintiff claim was evaluated by state agency Dr. Dyan Hampton-Aytch. (*Id.* at PageID.104–13.) Plaintiff was found to have a severe impairment of schizophrenia spectrum and other psychotic disorders. (*Id.* at PageID.109.) There was no RFC assessment made in Plaintiff's claim. (*Id.* at PageID.111.) Plaintiff was found to be not disabled. (*Id.*) Plaintiff was requested to furnish additional evidence of his claim, but he did not do so. (*Id.* at PageID.112.)

Plaintiff's mother submitted a letter regarding her son's disability claim to the Social Security Administration in April 2019. (*Id.* at PageID.248–49.) His mother described Plaintiff's history that included 1) Plaintiff being removed from the home and placed in the Oakland County Children's Village, 2) a $60,000 judgment in Plaintiff's favor, 3) general references to human rights violations, 4) Plaintiff's anger at the involuntary hospitalization at Providence Hospital, 5) Chase Bank's alleged mishandling of Plaintiff's civil judgment funds, 6) his alleged sexual assault and physical restraint at the hospital. (*Id.*) His mother claims that the State of Michigan Disability Determination Services, Havenwyck, Common Grounds, and Probate Judge Daniel O'Brien all labeled Plaintiff as disabled. (*Id.*) She stated Plaintiff has been oppressed; he suffers from chemical alteration of his mind; he suffers from full-body pains, nerve damage in his foot, and depression. (*Id.*)

10

## 2.     Application Reports and Administrative Hearings

### a.     Function Report

Plaintiff completed a function report on June 4, 2018 for his application for SSI. (ECF No. 11, PageID.202.) Plaintiff stated his condition makes him unable to work because

> DR. LEONARD SWISTAK establish [*sic*] and DANIEL A. O'BRIEN, PROBATE JUDGE ruled that I am mentally disabled, therefore, I am unable to work. The psychiatrist diagnoses me as '…schizoaffective disorder; bipolar type'. The psychiatrist agrees that, '…this disorder significantly impair [*sic*] his judgment, behavior, capacity to recognize reality, or the ability to cope with ordinary demands of life'. The psychiatrist affirms, '…danger to others is certainly evident'. . . . Four professionals and a judge insist that I may harm others stating facts that I am delusional and not in touch with reality. To ensure the safety of society I am unable to work.

(*Id.* at PageID.203.) Plaintiff, here, listed the doctors and their respective diagnoses of schizoaffective disorder; psychosis, not otherwise specified; and psychotic disorders, bipolar. (*Id.*)

Other than relaxing and caring for a cat, Plaintiff was not specific with his description of daily activities. (*Id.* at PageID.196.) Plaintiff has no problems with personal care. (*Id.* at PageID.196–97.) Plaintiff prepares his own food. (*Id.* at PageID.197.) He does indoor chores. (*Id.* at PageID.197.) He goes outside alone, and can travel via walking, riding in a car, or public transportation. (*Id.* at PageID.198.) Plaintiff does not have a car because of the costs associated with it. (*Id.*) Plaintiff can shop and handle money. (*Id.*) His interest includes Microsoft Excel. (*Id.* at PageID.199.)

Plaintiff speaks with his neighbors daily, and he goes to the store often. (*Id.*) He does not need reminders or someone to accompany him. (*Id.*)

Plaintiff said his condition affects his ability to follow instructions and understand. (*Id.* at PageID.200.) Plaintiff described conditions where he stops listening or paying attention. (*Id.*) He can follow written instructions and sometimes follow spoken instructions. (*Id.*) He does not get along well with some people. (*Id.* at PageID.201.) Plaintiff quit jobs because of other people. (*Id.*) He says he can handle stress and changes in routine. (*Id.*) Plaintiff stated he has unusual fears of the government. (*Id.*)

Plaintiff is not taking any medication for his condition. (*Id.* at PageID.202.)

### b.    Plaintiff's Testimony at the Administrative Hearing

Plaintiff receives treatment from Dr. Guy at Easter Seals. (*Id.* at PageID.81.) Plaintiff described the treatment is for "what happened to me get hospitalized is what he's treating me for." (*Id.* at PageID.82.) Plaintiff receives counseling from Dr. Guy and from a therapist named Markel. (*Id.*)

Plaintiff lives in a condo with his mother. (*Id.* at PageID.84.) He has a GED and completed college with a degree in finance and economics. (*Id.* at PageID.86–87.) Plaintiff is able to go to places by walking or taking a bus. (*Id.* at PageID.85.) Plaintiff described getting kicked off the bus one time because of a window issue and bad words exchanged with the driver. (*Id.* at PageID.85–86.)

Plaintiff smokes cigarettes and marijuana, but medication helped reduce the frequency of that. (*Id.* at PageID.86.)

Plaintiff described his three jobs and their duties as an Uber driver and as a worker for Walgreens and Sam's Club. (*Id.* at PageID.87–90.) Plaintiff was fired from Uber for bad customer service, and he quit the Walgreens job because he did not get along with

coworkers. (*Id.*) Plaintiff worked at Sam's Club for only about three weeks. (*Id.* at PageID.90.)

Plaintiff's income is through his mother's disability income. (*Id.* at PageID.91.) Plaintiff has not looked for work since filing for SSI. (*Id.*) He described difficulty finding work and then giving up; he also mentioned difficulties related to his felony record. (*Id.* at PageID.92.)

When asked what keeps him from working, Plaintiff replied that he is always angry at work, he has a bad mouth, he fights people, and he might go to jail or prison. (*Id.*) He stated at his last job, he wanted to kill a coworker. (*Id.*) Plaintiff spoke with Dr. Guy about this, and Dr. Guy wanted to prescribe medication, which Plaintiff will not take. (*Id.*) Plaintiff described an event that caused him to be scared of medication. (*Id.* at PageID.93.) Also, Dr. Guy and Plaintiff's therapist wanted Plaintiff to quit smoking marijuana, but Plaintiff indicated he becomes more restless and angrier without the marijuana. (*Id.*)

Plaintiff described being angry every day. (*Id.* at PageID.93–94.) He also watches TV, reads, and plays video games. (*Id.* at PageID.94–96.) Plaintiff does not participate in any clubs, groups, or organizations. (*Id.* at PageID.96.) Plaintiff helps his mother with cleaning and grocery shopping. (*Id.* at PageID.97.) Plaintiff does not need help with getting dressed or personal hygiene. (*Id.*) Plaintiff does his own laundry. (*Id.*) Plaintiff does not mow the lawn or shovel snow at home. (*Id.* at PageID.98.)

### c.   The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ inquired of the VE about the following hypothetical, assuming Plaintiff's age, education, and work history:

> Initially, I'd like for you to assume this individual would be limited to tasks that can be learned within 30 days that are routine in nature. This individual should be in an environment that requires no contact with the general public, and no more than superficial contact with coworkers, and no more than occasional contact with supervisors.

(*Id.* at PageID.100.) The VE identified this person could not return to Plaintiff's past relevant work. (*Id.*) The VE identified cleaners and packers jobs at the light and medium levels, all SVP: 1 or 2. (*Id.* at PageID.101.) The VE stated these jobs were representative, not exhaustive, of what could be done within the hypothetical. (*Id.*) The ALJ inquired about a hypothetical where the individual had difficulty getting along with coworkers or the supervisor and had regular altercations with a coworker or supervisor. (*Id.*) The VE responded that some altercations may result in immediate dismissal, or alternatively, there may be one or two warnings before dismissal. (*Id.*)

The VE said her testimony was consistent with the *Dictionary of Occupational Titles*, but the issues of worksite behavior and contact with supervisors, coworkers, and the public are based on her experience and training for that information. (*Id.* at PageID.102.)

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017,

distinguish between acceptable medical sources, medical sources and nonmedical sources.

An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

        (i)     A licensed or certified psychologist at the independent practice level; or

        (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a

16

medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

20

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

21

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can

reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

    (iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)     Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

    (2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

    (3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

    (4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

    (5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.     Arguments and Analysis

Plaintiff's claims of error in the ALJ's decision are incorrect, and accordingly neither summary judgment nor remand for Plaintiff are warranted.

Plaintiff's arguments are wanting of further development. In circumstances like this, a court would not formulate arguments for him, nor review the record for the possibility of inconsistencies in the record with the Commissioner's decision and then determine whether the Commissioner sufficiently accounted for the alleged inconsistency. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490–91 (6th Cir. 2006). Rather, the analysis here will be limited to "consideration [of] the particular points that [Plaintiff] appears to raise in [his] brief . . . ." *Id.* at 491.

Plaintiff's allegations of error—in the Commissioner's answer's denial and the appearance of attorney Nicole Sonia to represent the Commissioner—are meritless. Plaintiff offers no basis in the court rules to substantiate these claims.

### 1.     Sentence Six Remand

Plaintiff presents an issue related to the attachments of his motion for summary judgment. The attachments are the Oakland County Probate Court records in Plaintiff's mental health treatment case, including the petition, three clinical certificates, and the transcript of the proceedings in the case on April 23, 2018. (Pl. Br., ECF No. 13, PageID.513–53.) Plaintiff claims

> The above-mentioned exhibits are part of the record, but somehow were
> omitted. The above-mentioned exhibits are not new information and were
> previously presented for consideration. The record presented to the courts are
> inundated with reference to Claimant's, April 13, 2018 to April 27, 2018,

> involuntary hospitalization which made him totally mentally disabled but somehow the above exhibits are missing.

(*Id.* at PageID.509.) Plaintiff suggests that these exhibits were not considered by the Commissioner such that a sentence six remand is needed so the Commissioner can consider the new and material evidence. I suggest that Plaintiff cannot make the necessary showing that good cause excuses his failure to incorporate the evidence in the prior proceeding. 42 U.S.C. § 405(g).

Plaintiff has the burden to prove that he is disabled and that includes an ongoing duty to submit evidence that relates to whether or not he is disabled. 20 C.F.R. § 416.912. Although Plaintiff now argues that "somehow the above exhibits are missing", at the hearing before the ALJ—after the ALJ went through with detail about the respective lettered sections of Plaintiff's file—the ALJ inquired "does that sound right" "that your file is complete[?]", and Plaintiff responded "It should be complete." (ECF No. 11, PageID.79–81.) Further, Plaintiff admits that the records are not new. And based on the information provided, they are not material. "Evidence is material if there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Harrier v. Colvin*, 2017 WL 2927629 at *3 (E.D. Mich 2017) (citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). The documents provided are supportive of showing that Plaintiff required treatment under Michigan's Mental Health Code. *See* Mich. Comp. Laws. 330.1434 *et. seq.* These documents, alone, do not substantiate an inability of Plaintiff to perform substantial gainful activity, to say the least of the other requirements in the definition of disabled under Social Security. 42

U.S.C. § 1382c(3)(A). *See also* 20 C.F.R. § 416.904[4]. Further, the documents become dated in light of more recent and relevant developments of Plaintiff's case, based on the medical records admitted in evidence in the transcript of this case. Therefore, these documents are unlikely to result in a different disposition in Plaintiff's case. Finally, Plaintiff has not suggested good cause for failure to incorporate these documents into the record of the prior proceeding. Thus, in light of the lack of new and material evidence and an absence of good cause, a sentence six remand is not appropriate here.

Plaintiff raises a matter about conflict between the attached documents and Dr. Guy's diagnosis. Specifically, Plaintiff claims that Dr. Guy's diagnosis of intermittent explosive disorder is not supportive of involuntary placement in a mental institution as evidence by these attached documents. Again, the ALJ did not have these specific records to consider. Nevertheless, the ALJ was aware that Plaintiff "was diagnosed with acute psychosis" and "was admitted psychiatrically to a local hospital . . . and was involuntarily admitted by court order." (ECF No. 11, PageID.68.) The ALJ was aware that Plaintiff's condition while hospitalized improved with medication. (*Id.*) Further, the ALJ stated

> Although he was assessed with psychotic disorder through much of the record, by his February 2019 treatment evaluation, his psychiatrist revised the diagnosis to intermittent explosive disorder. (Ex. 3F, p. 42, 4F and 5F, p. 38). Treatment notes at Easter Seals show that, at the time of the alleged onset date of disability (AOD), the claimant reported using marijuana 1 or 2 times a week, "just to relax at the end of the day". (Ex. 3F, p. 3). Thereafter, the claimant readily admitted that he used the substance daily and was diagnosed with cannabis dependence. (Ex. 4F, 5F, pp. 15, 38 and 64).

---

[4] "Because a decision by any other governmental agency . . . about whether you are disabled . . . is based on its rules, it is not binding on us and is not our decision about whether you are disabled . . . under our rules." 20 C.F.R. § 416.904.

> However, the record is not consistent with mental disability. The claimant has not required a hospital or emergency room visit for depression or anxiety since the alleged onset date. While the claimant was symptomatic at the AOD, treatment notes thereafter show the claimant exhibited fair attention, normal speech, no evidence of hallucinations, his thought process was goal directed, his intellectual functioning was average, and his fund of knowledge and memory were intact. (Ex. 5F, pp. 35, 36, 37, 66, 67 and 68, and 6F, pp. 8-10). Additionally, his psychiatrist noted that the claimant's marijuana abuse exacerbated his explosive disorder and indicated that it further incited his noncompliance. (Ex. 5F, p. 10 and 6F, pp. 2 and 6). Throughout the record, the claimant made multiple statements that he treated primarily to get disability benefits. (Ex. 5F, pp. 31 and 42, and 6F, pp. 6, 12 and 15).

(*Id.*) This is an accurate recitation of the record. Rather than conflict, as Plaintiff suggests, the record shows, as the ALJ accurately summarized, Plaintiff's progressed with treatment from diagnosed psychosis to intermittent explosive disorder. Plaintiff is also recorded as being observed as having fair attention, normal speech, goal-directed thought process, average intellectual functioning, and intact memory.

Again, there is nothing new or material that the attached documents present that warrant remand in this case.

Next, Plaintiff presents for the first time, in his reply brief, one page of a nine-page document that states that Plaintiff has paranoid-type schizophrenia as of December 7, 2020. (Pl. Reply, ECF No. 16, PageID.595.) Plaintiff claims that "Dr. Guy has since revised his diagnosis in unification with his colleagues" and refers to the doctors and Judge in his mental health treatment case. (*Id.* at PageID.591.) This also is not supportive for remand under sentence six. Plaintiff clearly presents an incomplete document. It is not descriptive of any functional limitation. So, while this is new evidence, it is not clear that this document alone would be material. Further, the apparent date of the schizophrenia diagnosis is well

outside of the dates of the ALJ decision and the Appeals Council denial, where Plaintiff was found to be not disabled within that period of time of his claim. Assuming for a moment, and giving Plaintiff the benefit of the doubt, that Plaintiff is suggesting an aggravated or deteriorating condition, "the appropriate remedy would have been to initiate a new claim for benefits as of the date that the condition aggravated to the point of constituting a disabling impairment." *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988) (citations omitted).

### 2.      The ALJ's Step Two Evaluation

Plaintiff suggests error in the finding that Plaintiff's severe impairments were found to be intermittent explosive disorder and substance abuse disorder, based on Dr. Guy's diagnosis. A severe impairment is "one that affects an individual's ability to perform basic work-related activities" that is expected to last a continuous 12 months or result in death. SSR 16-3p; 20 C.F.R. § 416.920(a)(4)(ii). Plaintiff does not suggest a medically determinable impairment that meets the definition of a severe impairment. The record shows Plaintiff's psychotic disorder did not last a continuous 12 months of this record, from the point of his involuntary hospitalization in April 2018 to the February 2019 date of Dr. Guy's revised diagnosis. Similarly, as to the unadmitted attachments Plaintiff provides, nothing in this record suggests a 12-month continuity for the diagnoses of the conditions and any presumed limitations that preceded his involuntary hospitalization. Nevertheless, the fact that the ALJ found *a* condition to be severe is enough to move to the next step of the sequential evaluation. Even if we were to assume that any other condition was in fact severe, there is no reversible error at step two as long as the ALJ considered the

29

limitations associated with severe and non-severe impairments. 20 C.F.R. § 416.945; *See Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). In any event, Plaintiff does not suggest any further work-related limitations associated with any other alleged condition.

Therefore, the ALJ did not err in the evaluation at step two.

### 3.      The ALJ's Step Three Evaluation

Plaintiff claims that the ALJ erred in finding that Plaintiff's condition did not meet a listed impairment. The ALJ correctly analyzed Plaintiff's intermittent explosive disorder condition, given the medical evidence, and Listing 12.00(B)(3) of personality and impulse-control disorders identifies intermittent explosive disorder within Listing 12.08. Plaintiff claims, without analysis and without regard to the more recent medical evidence, that his condition meets Listing 12.03 for schizophrenia spectrum and other psychotic disorders. The above description of the evidence of Plaintiff's attention, speech, thought process, intellectual functioning, and memory are inconsistent with the signs and symptoms of schizophrenia spectrum and psychotic disorders. Listing 12.00(B)(4). Accordingly, the ALJ appropriately did not consider this listing. Next, returning to Listing 12.08, the ALJ considered the Paragraph B factors of whether there was one extreme limitation or two marked limitations in Plaintiff's mental functioning in the list of 1) understanding, remembering, or applying information, 2) interact with others, 3) concentrate, persist, or maintain pace, and 4) adapt or manage oneself. The ALJ identified that Plaintiff had a moderate limitation in each of these mental functions (ECF No. 11, PageID.67), and thus Plaintiff did not satisfy Paragraph B of the listing, and consequently, Plaintiff's condition

did not meet or medically equal a listing. Plaintiff does not offer evidence that substantiates an extreme or marked limitation in any of those mental functions.

Thus, the ALJ did not err in the evaluation at step three.

### 4.    Evaluation of opinion evidence

Plaintiff claims the ALJ did not articulate specific and legitimate reasons for disregarding the medical opinions in the records attached to his summary judgment motion. First, Plaintiff's cited attachment documents are not opinion evidence by the definition of the applicable regulation. 20 C.F.R. § 416.913(a)(2) & (a)(3). The documents do not state what Plaintiff can still do despite his impairment. The documents state and Plaintiff cites them for various diagnoses, which are not opinion evidence. Diagnoses are other medical evidence under 20 C.F.R. § 416.913(a)(3). Second—assuming for the sake of an argument the records were opinion—under the analysis above, these records were not part of the transcript record, and at this point, Plaintiff is not entitled to an ALJ's consideration of these records. Consequently, the lack of reasons here is understandable and excusable for the lack of error. In addition, Plaintiff does not engage in analysis of the document's alleged opinion's supportability or consistency with the rest of the medical evidence of record. Further, on review of the motion's attachments and given Plaintiff's claims in his motion, Plaintiff's weight given to the documented attachments appears to be focused on the matter of Plaintiff's diagnoses. However, the "mere diagnosis . . . says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) for the position that diagnosable impairment is not necessarily disabling). Plaintiff's arguments here do not persuade.

Plaintiff claims that the ALJ does not address the finding of Judge Daniel O'Brien that Plaintiff is totally disabled. The petition for his treatment requested 1) a determination that Plaintiff was a person requiring treatment and 2) a court order that orders appropriate mental health treatment. (ECF No. 13, PageID.514.) Judge O'Brien found a psychologist's testimony that Plaintiff needed treatment to be credible, and he so ordered treatment of 90 days, with 45 days inpatient. (*Id.* at PageID.552.) Nothing here suggests that Plaintiff is disabled under Social Security rules. Plaintiff does not develop an argument that the need for treatment, as provided by Michigan's Mental Health Code, at all equates to disability under the Social Security law and regulations. Further, even if this order was (again, it is not) a determination of disability at the Probate Court level, "Because a decision by any other governmental agency . . . about whether you are disabled . . . is based on its rules, it is not binding on us and is not our decision about whether you are disabled . . . under our rules." 20 C.F.R. § 416.904.

For these reasons, the ALJ did not and could not err with the absence of an evaluation of the attached documents. Further, the ALJ's evaluation of the actual opinion evidence, the state agency doctor and Plaintiff's mother, was appropriately evaluated.

### 5.    The ALJ's evaluation of Plaintiff's subjective symptoms

Plaintiff claims that his testimony was not credited with the alleged corroborating evidence. The ALJ identified Plaintiff's symptoms as

> The claimant alleges he is disabled because of psychosis, delusions, psychotic behavior and bipolar disorder. He reports that due to his impairments, he has no patience, is always angry, and cannot control his anger. The claimant asserts that he cannot go back to work because he is unable to behave in an appropriate and lawful manner.

(ECF No. 11, PageID.68.) This summary is consistent with Plaintiff's disability report (*id.* at PageID.188), his function report (*id.* at PageID.200–03), and his testimony that he is always angry at work, he fights people, and he might go to jail or prison (*id.* at PageID.92). The ALJ discounted these claims as not entirely consistent with the medical evidence and other evidence of record. (*Id.* at PageID.68.) The ALJ further cited the record evidence of Plaintiff's involuntary hospital admission, his initial symptoms and diagnosis of psychosis, Plaintiff's improvement with medication, his revised diagnosis to intermittent explosive disorder, his cannabis dependence diagnosis, his lack of further emergency room treatment or depression/anxiety, his improved functioning (in attention, speech, thought process, intellectual functioning, memory, and the absence of hallucinations). (*Id.*) This explanation, with its citation to the record evidence, is consistent with SSR 16-3p.

Plaintiff's complaint states that the Commissioner's decision does not discuss "serious side effect and lasting psychological damage of Haldol and other medication". (ECF No. 1, PageID.3.) Similarly, Plaintiff claims in his motion that the ALJ "erred by not taking into account Claimant being involuntarily administered psychochemical drugs as treatment . . . ." (Pl. Br., ECF No. 13, PageID.510.) No medical record discusses lasting medication side effects, nor does Plaintiff supply evidence to substantiate the claim. In fact, the evidence, as the ALJ discussed, substantiates the opposite, in that Plaintiff showed improved functioning with treatment. Plaintiff's summary judgment motion does not suggest or develop a medication side-effect argument within the RFC, which suggests that Plaintiff has abandoned that argument. *See*, *e.g.*, *Burley v Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016); *Miller v. Comm'r of Soc. Sec.*, 2016 WL 1060357 at *1, n.2 (W.D. Mich. 2016);

*Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014); *Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002).

### 6.      The ALJ's RFC, Step Four, and Five evaluations

Except for the medication side-effect issue that was disposed above, Plaintiff does not suggest error with the RFC. Plaintiff does not suggest error with steps four or five of the sequential evaluation. Accordingly, Plaintiff has waived argument related to these possible claims.

### H.      Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 13), **GRANTING** the Commissioner's motion, (ECF No. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 3, 2021                          S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge